UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MARIO CAVIN #326204,

    Plaintiff,

v.       Case No. 2:17-cv-00031

    HON. ROBERT J. JONKER

PATRICIA DWIGHT BELFRY, et al.,

    Defendants.
_____/

### REPORT AND RECOMMENDATION

This is a civil rights action brought by state prisoner Mario Cavin pursuant to 42 U.S.C. § 1983. Plaintiff alleges that he was strip searched in the presence Defendant Sergeant Patricia Dwight Belfry, who is female, and other prisoners in violation of his privacy rights. Plaintiff transferred from the G. Robert Cotton Correctional Facility to the Marquette Branch Prison for a court hearing on or about October 13, 2015. On October 27, 2015, he reported to the prison Chapel for a search before being shackled and placed on the transportation bus back to the G. Robert Cotton Correctional Facility. Plaintiff was ordered by Defendant John Doe to remove his clothing in front of 15 to 20 other prisoners, under camera observation, and in the presence of Defendant Belfry. Plaintiff alleges that his Fourth Amendment right to privacy was infringed by Defendant Belfry's conduct. Defendant Belfry filed a motion for summary judgment (ECF No. 25).[1] Plaintiff filed a response (ECF No. 27).

---

[1] Plaintiff has been unable to identify Defendant John Doe.

Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Id.* at 324-25. The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The evidence must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (*citing Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)). However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient. *Anderson*, 477 U.S. at 251-52. Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. *See also Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

Defendant moves for dismissal based upon qualified immunity. Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Dietrich v. Burrows*, 167 F.3d 1007, 1012

2

(6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Dietrich*, 167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

In making a qualified immunity determination the court must decide whether the facts as alleged or shown make out a constitutional violation or whether the right that was allegedly violated was a clearly established right at the time of the alleged misconduct. *Id.* at 232-233. If the court can conclude that either no constitutional violation occurred or that the right was not clearly established, qualified immunity is warranted. The court may consider either approach without regard to sequence. *Id.*

In *Hudson v. Palmer*, 468 U.S. 517 (1984) the Supreme Court addressed the question of whether an inmate had any right of privacy in his prison cell entitling him to protection of the Fourth Amendment against unreasonable searches and seizures. *Id.* at 522. The Court reviewed its cases establishing that prisons are not beyond reach of the Constitution as well as the fact that "imprisonment carries with it the circumscription or loss of many significant rights." *Id.* at 523-24. "The applicability of the Fourth Amendment turns on whether the person invoking its protection can claim a justifiable, a reasonable or legitimate expectation of privacy that has been invaded by government action. We must decide in Justice Harlan's words whether a prisoner's

3

expectation of privacy in his prison cell is the kind of expectation that society is prepared to recognize as reasonable." *Id*. at 525 (citations omitted). The Supreme Court went on to hold that a prisoner has no reasonable expectation of privacy in his prison cell under the Fourth Amendment.

> Notwithstanding our caution in approaching claims that the Fourth Amendment is inapplicable in a give context, we hold that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell, and that accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions.
>
> . . .
>
> Determining whether an expectation of privacy is "legitimate" or "reasonable" necessarily entails a balancing of interests. The two interests here are the interest of society in the security of its penal institutions and the interest of the prisoner in privacy within his cell. The latter interest, of course, is already limited by the exigencies of the circumstances: A prison "shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room." *Lanza v. New York*, 370 U.S. 139, 143-144 (1962). We strike the balance in favor of institutional security, which we have noted is "central to all other correctional goals." *Pell v. Procunier*, 417 U.S. at 823. A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to insure institutional security and internal order. We are satisfied that society would insist that a prisoner's expectation of privacy always yield to what must be considered the paramount interest of institutional security. We believe that it is accepted by our society that "[l]oss of freedom of choice and privacy are inherent incidents of confinement. *Bell v. Wolfish*, 441 U.S., at 537.
>
> . . .
>
> Our holding that respondent does not have a reasonable expectation of privacy enabling him to invoke the protections of the Fourth Amendment does not mean that he is without a remedy for calculated harassment unrelated to prison needs. . . . The Eighth

4

>Amendment always stands as a protection against "cruel and unusual punishments."

*Id*. at 525-26, 527-28, 530.

The Sixth Circuit has recognized a prisoner's limited constitutional right under the Fourth Amendment to be free from observation of his private bodily parts by officers of the opposite sex, without penological justification. *Kent v. Johnson*, 821 F.2d 1220 (6th Cir. 1987). "[T]his Circuit has joined others in recognizing that a convicted prisoner maintains some reasonable expectations of privacy while in prison, particularly where those claims are related to forced exposure to strangers of the opposite sex, even though those privacy rights may be less than those enjoyed by non-prisoners." *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992) (reversing judgment for plaintiff on Fourth Amendment privacy claim, due to jury instruction error).

The *Kent* court recognized a limited right of privacy that protects prisoners "from being forced unnecessarily to expose their bodies to guards of the opposite sex." 821 F.2d at 1227. The *Kent* case arose from the complaint of a Michigan prisoner, who alleged that female prison guards had unrestricted access to all areas of the housing unit, including the toilet and shower areas. The Sixth Circuit reversed dismissal of the complaint, finding that the complaint stated a claim in that prison officials have a constitutional duty to afford reasonable accommodation to a limited privacy interest retained by prisoners in this regard. *Id.* at 1226-28. On motion for reconsideration, the court determined that plaintiff's claim must be judged by the standard of reasonableness established by the Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987).

On remand, the court determined that the policy at issue was reasonably related to the Department of Corrections interests in hiring women on a nondiscriminatory basis and placing

5

female guards in positions within the correctional facility where they would have daily contact with inmates. "Allowing the women guards to have official responsibilities including responsibility of escorting an inmate to the shower is rationally connected to this governmental interest." *Kent v. Johnson*, No. 84-cv-71307-DT, 1990 WL 507413, at * 4 (E.D. Mich. Aug. 3, 1990).

The Sixth Circuit held in *Mills v. City of Barbourville*, 389 F.3d 568 (6th Cir. 2004), that a male officer who accidently viewed a female inmate during a strip search was entitled to qualified immunity, despite plaintiff's claim that the male officer stopped and stared at her exposed breasts without immediately looking away. The plaintiff failed to show that the male officer planned or intentionally sought out the female inmate to observe her during the strip search. Officers should be careful not to strip search a prisoner under circumstances that are humiliating and without a penological justification. As explained in *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 575 (6th Cir. Jan. 31, 2013), the Sixth Circuit denied an officer qualified immunity for an invasive, same-sex strip search conducted in the view of others under degrading circumstances without a showing of a sufficient legitimate penological need to search. Dismissal is not appropriate where the record fails to support a penological justification for a strip search. *Williams v. City of Cleveland*, 771 F.3d 945, 955 (6th Cir. 2014) (Judgment on the pleadings was not appropriate based upon allegations that the jail acted unreasonably by conducting group pretrial detainee strip searches and spraying a delousing agent.)[2]

---

[2] On remand, the district court held that conducting strip searches without privacy panels and using spraying delousing fluid on detainees violated the Fourth Amendment. *Williams v. City of Cleveland,* 210 F. Supp.3d 897 (N.D. Ohio, E.D., 2016).

6

Generally, a court must defer to the judgment of prison officials unless the record establishes that prison policies and procedures are unreasonable. *Florence v. Board of Chosen Freeholders County of Burlington*, 566 US. 316, 322-323 (2012). "The constitutionality of the searches at issue in this case involves a three-step analysis. First, we determine the nature of the intrusion, 'examin[ing] the scope, manner, and location of the search.' *Stoudemire*, 705 3d at 572. Second, we 'evaluate the need for the search, giving due deference to the correctional officer's exercise of her discretionary functions.' *Id*. And third, 'we determine whether the search was reasonably related to the penological interests by weighing the need against the invasion.' *Id*." *Sumpter v. Wayne County*, 868 Fl.3d 473, 482 (6th Cir. 2017).

Applying these factors, Plaintiff has asserted that he was strip searched in the Chapel as part of a group of prisoners. Plaintiff alleges that he was required to undress exposing himself to the other prisoners and to Defendant who was present in the Chapel. The search was conducted in front of a surveillance camera and within view of a window, where several other corrections officers had gathered during the group search. Plaintiff asserts that there was no penological justification for this type of humiliating and degrading search in front other prisoners and female officers. Defendant argues in her brief that there was a penological need for the search. Defendant has failed to support her argument with any evidence. Defendant 's sole support for her motion is her answers to Plaintiff's interrogatory requests and Plaintiff's own exhibits. Defendant's responses to Plaintiff's interrogatories state:

> 1. Describe your duties as it relates to supervising the transportation of prisoners.
>
> **RESPONSE:** My responsibilities included, but were not limited to, overseeing the transportation of prisoners and supervising the Correction Transportation Officers.

7

2. Whose decision was it to conduct the mass strip searches in the chapel on Oct. 27, 2015 at MBP?

**RESPONSE:** According to MBP-OP 05.0l.140A Security and Processing of Incoming Prisoners (Exempt) Level V prisoners were processed in the Level V Chapel as determined by Shift Command.

3. Are these strip searches usually conducted in view of several others?

**RESPONSE:** P.D. 04.04.110 Search and Arrest in Correctional Facilities, states that a strip search shall be conducted in a place which prevents the search from being observed by those not assisting in that search. The defendant removed herself from the viewing area during the strip searches.

4. What other areas within MBP are used, or could have been used to conduct strip search of prisoner riding out?

**RESPONSE:** Defendant objects to this interrogatory on the basis of relevance as it is not relevant that other areas may have been able to be used as this search was conducted in an area that complied with the requirements in the transportation Manual and MBP-OP 05.0l.140A Security and Processing of lncoming Prisoners (Exempt).

5. Prior to becoming a transportation sergeant, what other positions have you held within the MDOC?

**RESPONSE:** Corrections Officer and Sergeant.

(Defendant's Response To Plaintiffs Request For Interrogatories, ECF No. 26-1, PageID.135-136).

The Sixth Circuit explained:

"[A] strip search, by its very nature, constitutes an extreme intrusion upon personal privacy." *Id.* (quoting *Wood v. Clemons*, 89 F.3d 922, 928 (1st Cir. 1996)); *see also Williams*, 771 F.3d at 952. The act of a stranger examining the most private areas of one's body "is 'an offense to the dignity of the individual' that is 'undoubtedly humiliating and deeply offensive to many[.]' " *Williams*, 771 F.3d at 952 (quoting *Stoudemire*, 705 F.3d at 572–

8

> 73). Intrusive under ideal circumstances, strip searches are especially humiliating when they are conducted in front of other inmates: "The wider an audience for a strip search, the more humiliating it becomes, especially when the stripped individual is exposed to bystanders who do not share the searching officers' institutional need to view her unclothed." *Id.* at 953. The same applies to strip searches conducted in a discourteous manner. *See Stoudemire*, 705 F.3d at 573.

*Sumpter*, 868 Fd.3d at 483.

Plaintiff alleges in this case, that he was strip searched in the Chapel before being transported out of the prison, in the presence of fifteen to twenty other inmates and three corrections officers, including Defendant Belfry who stood near the exit. Plaintiff alleges that at least five other corrections officers were outside the Chapel in the hallway near a large window that provided a view into the Chapel. Plaintiff also asserts that he was strip searched right in front of a security camera.

Defendant Belfry provides a conclusory argument for the reason for the strip search. In her brief she states: (1) "it was a high level security area" and (2) "these were prisoners that were on their way to be transported out of the prison with only three officers involved." Defendant has made no effort to explain the need for the group strip search. In fact, in her answers to interrogatories, she relies solely on a policy directive regarding searching incoming prisoners. According to Defendant, that policy is "exempt" from discovery and is not part of the Court record. Defendant has failed to provide any evidence or support for her argument that there existed a penological need for the group strip search. Additionally, Defendant has not explained why she was present during the search.

Finally, Plaintiff asserts that there was no need for the officers to conduct a group strip search in the presence of a female officer, several other officers, and other

9

prisoners. Plaintiff has submitted an affidavit from prisoner Ramiro Venegas who states that he was transferred out of MBP in August of 2017. At that time, there were approximately ten prisoners being transferred who had gathered in the Chapel for strip searches, which were not conducted in a group fashion. Instead, the searches were conducted in an adjacent restroom, a nearby office, or in the Chapel using a privacy curtain. (ECF No. 27-1, PageID. 146-147). Defendant Belfry has failed to explain why this procedure was not employed at the time Plaintiff was searched.

These factors are weighed in determining whether Defendant Belfry is entitled to qualified immunity from liability. In upholding qualified immunity in *Sumpter*, the Sixth Circuit distinguished *Williams* and *Stoudemire*.

> First consider *Williams*. The procedural posture of the case required this court to accept as true the plaintiff's plausible allegation that the defendants had no legitimate justification for conducting group strip searches. *Williams*, 771 F.3d at 949, 956. Thus, we had no occasion to evaluate any proposed penological justification, let alone weigh it against the nature of the intrusion. Indeed, *Williams* itself recognized that its holding did not extend to cases like the one before us: "[O]f course, the jail may have had good reasons for conducting these procedures in the particular manner in which it did[,] [b]ut that is a matter for resolution ... on summary judgment [.]" *Id.* at 955 (citation omitted); *see also id.* ("Whether the particular manner in which the jail conducted the searches ... was 'justified' depends on the facts[.]").
>
> Unlike *Williams*, the present case comes to us at the summary judgment stage, and Wayne County and Graham have provided a legitimate penological justification for the periodic group strip searches; a justification that Sumpter has not disputed. As a result, we are obligated to consider their evidence. *Compare id.* at 956 ("[T]he district court cannot have opined that the jail's conduct was 'justified' without examining the evidence—which, of course, it cannot do when determining merely whether the proposed complaint failed to state a claim."), *with Celotex Corp.*

10

> *v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of ... identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." (internal quotations omitted)).
>
> Next consider *Stoudemire*. The plaintiff in that case presented evidence that there was no exigency or "time or resource constraints" to justify conducting the search where others could see the plaintiff naked, which led this court to hold that the search was "devoid of any legitimate penological justification." *Stoudemire*, 705 F.3d at 574–75. In the absence of a governmental interest, the outcome of the balancing test was obvious, so obvious that any reasonable officer in the defendant's position would have known that the search was unreasonable. *Id.* at 575; *see also Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005) (holding that violation of a "'clearly established' constitutional right" occurs "where the violation was sufficiently 'obvious' under the general standards of constitutional care").
>
> In stark contrast to *Stoudemire*, however, Graham testified without contradiction that she conducted group searches when time and resource constraints required it. *Cf. Stoudemire*, 705 F.3d at 574. Thus, the clearly established right recognized in *Stoudemire*—a public strip search "devoid" of justification— could not have put a reasonable officer on notice that what Graham did—a group strip search *supported* by a legitimate penological justification—was unconstitutional.

*Sumpter*, 868 Fd.3d at 486-487.

Although, this case is at the summary judgment stage, Defendant has failed to present a developed factual record beyond the initial pleading stage. The factual record is similar to when the court conducted the initial review of the complaint. Defendant Belfry has attached only interrogatory answers to support her motion. Those answers fail to satisfy her burden of establishing a qualified immunity defense. Defendant Belfry fails to indicate the need for the group strip search in her presence. Defendant Belfry states that "she removed

11

herself from the viewing area." Plaintiff states that Defendant Belfry was standing inside the Chapel the entire time he was being searched and the search was conducted in Defendant Belfry's view. In addition, Plaintiff asserts that other inmates and guards were able to view him during the strip search. In the opinion of the undersigned, genuine issues of material fact exist on Plaintiff's Fourth Amendment claim. Defendant has failed to properly support her motion for summary judgment with relevant evidence showing the existence of a legitimate penological need for the group strip search and why her presence inside the Chapel was necessary at the time of the search.

Accordingly, it is recommended that Defendant's Motion for Summary Judgment (ECF No. 25) be denied.

       /s/ Timothy P. Greeley
      TIMOTHY P. GREELEY
      UNITED STATES MAGISTRATE JUDGE

Dated: July 5, 2018

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).